## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE P. MURPHY**, <br><br> Plaintiff, <br><br> v. <br><br> **KRISTI NOEM, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY**, <br><br> Defendant. | Case No. 19-cv-1954 (TSC) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Jane Murphy—former Assistant Director for the Office of Government Liaison and Public Affairs for the U.S. Secret Service—sued Kristi Noem,[1] the Secretary of the Department of Homeland Security ("DHS"),[2] alleging that DHS discriminated against her based on age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a), and gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42.U.S.C. § 2000e, *et seq*. ("Title VII"). Compl. ¶¶ 29–34, ECF No. 1. She also alleges that she was constructively discharged because of her age and gender. *Id.* ¶ 4.

Defendant has moved for summary judgment. Def.'s Mot. for Summ. J. ("Def.'s MSJ"), ECF No. 43. For the reasons below, the court will GRANT Defendant's motion for summary judgment.

---

[1] Plaintiff's Complaint names as Defendant Kevin McAleenan in his capacity as Acting DHS Secretary. Noem, the current Secretary, is automatically substituted as Defendant. Fed. R. Civ. P. 25(d).

[2] The U.S. Secret Service is a component of DHS.

1

# I.    BACKGROUND

## A.  Factual Background

Plaintiff served as Assistant Director of the U.S. Secret Service ("Secret Service," or "Agency") Office of Government Liaison and Public Affairs ("Government and Public Affairs") from February 10, 2013, until her retirement on January 31, 2015.  Def.'s Stmt. of Undisputed Material Facts ("Def.'s SUF") ¶¶ 1–2, 98, ECF No. 44-1; Pl.'s Partial Resp. to Def.'s SUF ("Pl.'s SUF") ¶ 98, ECF No. 61-2.  Plaintiff is female and retired at fifty-five years old.  Def.'s SUF ¶ 3.

As Assistant Director, Plaintiff was responsible for the planning, development, and coordination of operations and procedures for Government and Public Affairs, handled Congressional correspondence and public matters, and ensured "the accuracy, currency and proper emphasis of all government liaison/public affairs program activities, including written materials prepared for issuance to the mass media."  *Id.* ¶¶ 4–6.  She also advised the Director on all government liaison and public affair issues.  *Id.* ¶ 7.  Plaintiff received strong performance ratings, including an "Exceeds Expectations" on her 2013 Annual Performance Review and an "Achieved Excellence" on her 2014 Annual Performance Review.  *Id.* ¶¶ 13–14.  From October 6, 2014, until her retirement, Plaintiff's second-line supervisor was Acting Director Joseph Clancy ("Clancy").  *Id.* ¶ 10.

Two high-profile security incidents occurred in September 2014 in which the Secret Service failed to execute its security plans.  *Id.* ¶¶ 16–20.  In the first, an unvetted, armed security guard with a criminal history was permitted to enter an elevator with President Obama during the President's visit to the Centers for Disease Control and Prevention.  *Id.* ¶ 16.  In the second, which occurred only three days later, an individual with a knife climbed over the White House's North Fence Line, ran across the North Lawn, and entered the White House, prompting a partial

evacuation. *Id.* ¶¶ 18, 20. The intruder got past an officer at the White House doorway and was finally apprehended right outside the Green Room. *Id.* ¶ 19. The Secret Service's initial statements to the press about the fence jumping incident were incorrect. *Id.* ¶¶ 22–25.

Because of these incidents, former Secret Service Director Julia Pierson was called to testify before the Committee on Oversight and Government Reform on September 30, 2014, and on October 1, 2014, she resigned from her position. *Id.* ¶¶ 26–27.

On the same day Director Pierson resigned, DHS Secretary Jeh Johnson announced that he was forming an independent "Blue Ribbon Panel" to assess, among other things, the security of the White House compound and to make recommendations regarding new Secret Service leadership, including new directors. *Id.* ¶ 28. On October 6, 2014, Secretary Johnson designated Joseph Clancy as Acting Secret Service Director. *Id.* ¶ 29.

Once appointed, and with a mandate from DHS to assess and implement changes to Secret Service senior leadership, Clancy began to observe each Assistant Director, including Plaintiff, during routine staff meetings and other settings. *Id.* ¶ 34. He sought leaders who had "dynamic, fresh ideas, and a vision for the future." *Id.* ¶ 40. On December 15, 2014, the Blue Ribbon Panel released its classified Blue Ribbon Panel Report ("Report"), along with an unclassified Executive Summary. *Id.* ¶ 51; Def.'s MSJ Ex. 7, Unsworn Decl. of Joseph Clancy ¶ 22 ("Clancy Decl."), ECF No. 43-9. The Executive Summary of the Report states:

- "From agents to officers to supervisors, we heard a common desire: More resources would help, but what we really need is leadership."
- "The Panel has concluded that the Service needs strong, new leadership that can drive change within the organization."
- "... the new leadership needs to think carefully about how the agency's core priorities are implemented up and down the organization, and focus on improving them."
- "In other words, agency leadership, managers, and front line supervisors must believe and show that they are accountable for their mission."

- "The necessary changes will require strong leadership, but they will also require resources."
- "Some of the changes address isolated problems, with well-defined options to solve them, while others will require far more study by, we hope, a dynamic new management team that will lead the Service into the future."

Clancy Decl. ¶ 22.

Clancy's Executive Staff included the Assistant Directors from various directorates within the Secret Service, including Plaintiff; the Chief Counsel; and other executive staff. Def.'s SUF ¶ 12. After a few months of observing his Executive Staff, Clancy came to his conclusion regarding leadership changes, and on January 13, 2015, Clancy informed Plaintiff and three other Assistant Directors—Mark Copanzzi, Dale Pupillo, and Paul Morrissey—that they would be reassigned to other DHS components. *Id.* ¶¶ 58–59. Copanzzi, Pupillo, and Morrissey are all male, and at the time, were between 57 to 60 years old. *Id.* ¶ 60. Clancy chose to retain two male Assistant Directors—Faron Paramore, 48 years old, and Craig Magaw, 51 years old—and Chief Counsel Donna Cahill, who is female and was then 56 years old. *Id.* ¶ 61; Clancy Decl. ¶ 24. Paramore ultimately replaced Plaintiff. Def.'s SUF ¶ 103.

According to Defendant, Clancy decided to reassign Plaintiff because he believed that she lacked the "innovative, dynamic leadership qualities that he was looking for in senior leaders at the Secret Service, and that he believed the Blue Ribbon Panel said that the Secret Service needed." *Id.* ¶ 62. Plaintiff disputes whether this was Clancy's "actual conclusion" and whether the Report was the basis for her reassignment given that his conclusion "starkly" contradicted both the findings of the Report and the mandates given to him by Secretary Johnson and Congress. Pl.'s SUF ¶ 62.

During their January 13 meeting, Clancy denied Plaintiff's request for reassignment to another position within the Secret Service. Def.'s SUF ¶ 83. At that same meeting, Plaintiff and

Clancy also discussed the possibility of Plaintiff's retirement. *Id.* ¶ 86; Pl.'s SUF ¶ 86. Plaintiff was given thirty days to decide whether she wanted to retire or a few days to decide whether she wanted to accept the reassignment. Def.'s SUF ¶ 87; Pl.'s SUF ¶ 87. She retired on January 31, 2015. Def.'s SUF ¶ 98.

### B. Procedural History

On February 25, 2015, Plaintiff contacted an Equal Employment Opportunity ("EEO") Counselor. *Id.* ¶ 106. On December 30, 2015, DHS issued a Final Agency Decision dismissing her constructive discharge and discrimination claims. *Id.* ¶ 107. On March 30, 2017, the Merit Systems Protection Board issued an Initial Decision finding it lacked jurisdiction over Plaintiff's constructive discharge claim. *Id.* ¶ 108. Plaintiff sought review of this decision with the Equal Employment Opportunity Commission ("EEOC"), which referred her case back to the Agency for further processing as a non-mixed case. *Id.* ¶¶ 109–10. On June 29, 2017, she requested a hearing before the EEOC but later withdrew that request and asked instead for a Final Agency Decision. *Id.* ¶¶ 111–12. On April 1, 2019, the Department issued a Final Agency Decision denying her claims. *Id.* ¶ 113.

On June 28, 2019, Plaintiff filed this action, alleging sex discrimination under Title VII, age discrimination under the ADEA, and constructive discharge based on the reassignment decision. Compl. ¶¶ 4, 29–34. Defendant first moved to dismiss on January 17, 2020, for improper service of process but the court stayed the case, given the pendency at the time of *Morrissey v. Mayorkas*, 19-cv-1956, in the D.C. Circuit. *See* March 17, 2021 Min. Order. After the decision in *Morrissey*, 17 F.4th 1150, 1153 (D.C. Cir. 2021), the parties reset their briefing deadlines, and on December 9, 2021, Defendant filed its renewed motion to dismiss, ECF No. 17, which the court ultimately denied, ECF No. 21. On November 27, 2024, Defendant moved for summary judgment.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court will grant summary judgment to a moving party who has shown that there is no genuine issue as to any material fact and thus the moving party is entitled to judgment as a matter of law.  A "material fact" is one that "might affect the outcome of the suit," and a dispute about a material fact is considered "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court determines which facts are "material" by looking at the substantive law on which each claim rests.  *Id.*

The moving party bears the burden of initially demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party may defeat this showing by pointing to facts in the record that constitute more than a mere "scintilla of evidence," demonstrating a genuine dispute of fact that must be resolved by a trial.  *Anderson*, 477 U.S. at 252; *Celotex*, 477 U.S. at 324.  In deciding a motion for summary judgment, the court must accept the nonmoving party's evidence as true and draw "all justifiable inferences" in their favor.  *Anderson*, 477 U.S. at 255.

## III.    ANALYSIS

### A. Disparate Treatment under Title VII and ADEA

Title VII and the ADEA prohibit an employer from discriminating against an employee based on gender and age.  Under Title VII, it is unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1); *id.* § 2000e-16(a) ("All personnel actions affecting employees or applicants for employment" in the federal government "shall be made free from discrimination

based on . . . sex[.]").  Under the ADEA, "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age" in Executive agencies.  29 U.S.C. § 633a(a).

Where, as here, a plaintiff has offered indirect evidence of discrimination, the familiar *McDonnell Douglas* framework applies.  *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999) (explaining that the *McDonnell Douglas* framework applies to both Title VII and ADEA claims).  Under *McDonnell Douglas*, a plaintiff must make a *prima facie* showing of discrimination.  In a disparate treatment case, this requires showing that the plaintiff: (1) belongs to a protected class, (2) experienced an adverse employment action, and (3) the adverse employment action yields an inference of discrimination.  *See George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citation omitted).

Once an employer comes forward with a legitimate, non-discriminatory reason for the challenged employment action, however, the court need not "*and should not*" analyze the *prima facie* case.  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  Instead, the court need only ask if "the evidence creates a material dispute on the ultimate issue."  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (citing *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)).

The court's focus, then, is on whether the plaintiff "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the [plaintiff]" on a prohibited basis.  *Brady*, 520 F.3d at 494.  The court should assess the plaintiff's challenge to the employer's explanation "in light of the total circumstances of the case."  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc).

### B. Adverse Employment Action

In most employment discrimination cases, "there is no dispute that the employee has suffered an adverse employment action, and the sole question is whether the action occurred because of discrimination." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). But here, Defendant argues that Plaintiff fails to establish any adverse action to support her discrimination claims because (1) her work reassignment was never realized, (2) she voluntarily retired and therefore was not constructively discharged, and (3) without a showing of constructive discharge there are no remaining adverse actions to support her discrimination claims. *See* Def.'s Mem. in Support of MSJ ("Def.'s Mem.") at 16–24, ECF No. 43-1.

The D.C. Circuit defines an adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). In *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), the Supreme Court recently clarified that Title VII requires an employee to show only that a job transfer "brought about some 'disadvantageous' change in an employment term or condition." *Id.* at 974 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The employee need not show "that the harm incurred was significant"—"[o]r serious, or substantial, or any other similar adjective." *Id.* (citation and internal quotation marks omitted). *Muldrow* recognized that "[m]any forced transfers" will clear that bar. *Id.*

#### a. *Reassignment and Retirement*

Plaintiff bases her claims on her reassignment and retirement, which she argues are adverse actions. On January 13, 2015, Clancy told Plaintiff that she was being reassigned to another DHS

component because he "was looking for a fresh perspective and that his decision was based on his assessment of each Assistant Director's performance as well as the results of the Blue Ribbon Panel." Def.'s SUF ¶ 71.  He denied Plaintiff's request to be reassigned to another position within the Secret Service.  *Id.* ¶ 83.  Defendant contends that Plaintiff mentioned retirement as a possibility, *id.* ¶ 86, though Plaintiff maintains that Clancy brought up retirement as her only alternative to reassignment.  Pl.'s SUF ¶ 86.  Plaintiff was given thirty days to decide whether to retire but only one or two days to decide whether to accept the reassignment.  Def.'s SUF ¶¶ 87–88.  She characterizes this as an ultimatum between retirement or reassignment outside the Secret Service, which she viewed as essentially forcing her out.  Pl.'s SUF ¶¶ 75, 88.

The next day, Plaintiff again met with Clancy.  *Id.* ¶¶ 89–90.  She reiterated her desire to stay with the Secret Service, but Clancy repeated that any reassignment would be outside the Secret Service, though he could provide no further details.  *Id.*  Plaintiff also asked "whether she could retire and be rehired as an annuitant with the other component of the Department" and recalled that he said he would try to find answers to her questions.  *Id.* ¶ 90.

On January 21, 2015, eight days after their initial meeting, Plaintiff again met with Clancy, who told her that DHS was considering reassigning her to U.S. Customs and Border Protection or U.S. Immigration and Customs Enforcement but could not offer more information, including a position description.  *Id.* ¶¶ 91–92.  Although she was still waiting on specific details about the reassignment, Plaintiff said she would have her retirement papers prepared.  *Id.* ¶¶ 94.  Later that day, Clancy called Plaintiff and told her that it would not be possible to rehire her as a retired annuitant and that he had her retirement papers, but asked her if she wanted more time to consider her options.  *Id.* ¶ 95.  She declined and told him to sign her retirement papers.  *Id.* ¶ 95; *see* Def.'s MSJ Ex. 2, Jane P. Murphy Dep. Tr. (June 7, 2016) ("Def.'s 2016 Murphy Dep. Tr."), at 163:11–

164:10, ECF No. 43-4. Her retirement became effective on January 31, 2015. Pl.'s SUF ¶¶ 98–99.

Plaintiff testified that she chose retirement because she believed reassignment outside the Secret Service might jeopardize her pension benefits. *Id.* ¶¶ 94–97. She also testified that a pension representative told her that she could not return to DHS as a rehired annuitant if she retired. *Id.* ¶¶ 93–96; *see* Def.'s 2016 Murphy Dep. Tr. at 163:11–164:8.

b. *Plaintiff's Reassignment Constitutes An Adverse Action*

Defendant first argues that Clancy did not actually implement his decision to reassign Plaintiff, and she therefore cannot establish that she suffered an adverse action. Def.'s Mem. at 23–24. But it does not "matter to the adverse-action analysis" that Plaintiff's transfer was " never effectuated." *Van Horn v. Del Toro*, No. 23-5169, 2024 WL 4381186, at *3 (D.C. Cir. Oct. 3, 2024). In *Van Horn*, an ADEA employment discrimination case, the employer challenged whether plaintiff suffered an adverse action because one of their job transfers never occurred. *Id.* The D.C. Circuit emphasized that "an adverse employment action becomes cognizable when the employer provides notice of the action to the employee, 'regardless of whether the employer follows through.'" *Id.* (citation omitted); *accord Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019) (recognizing a notice of termination is a cognizable adverse action regardless of whether employer follows through); *see also Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." (cleaned up)); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10th Cir. 2011) ("[A] claim accrues when the disputed employment practice—the demotion, transfer, firing, refusal to hire, or the like—is first announced to the plaintiff."). As in *Van Horn*, the court finds that Plaintiff's reassignment was an adverse

employment action when she was told of the reassignment. Consequently, Defendant's first argument—and necessarily, its third argument—fails.

c.  *Plaintiff Fails to Show Constructive Discharge*

As to Defendant's second argument on constructive discharge, the court grants summary judgment on this claim because Plaintiff fails to point to sufficient evidence of intolerable work conditions that would drive a reasonable person to quit.

An employee's resignation or retirement is presumed to be voluntary and not an adverse action unless the employee shows that the resignation or retirement was involuntary and therefore amounted to a constructive discharge. *Aliotta v. Bair,* 614 F.3d 556, 566–67 (D.C. Cir. 2010). To prevail on a constructive discharge claim, a plaintiff must show that "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified [her] conclusion that she had no option but to end her employment." *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 102 (D.D.C. 2011) (quoting *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 81 (D.D.C. 2009)).

In this Circuit, constructive discharge "depends on whether the employer deliberately made working conditions intolerable and drove the employee" out. *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (citation omitted); *see also Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) ("The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"). Workplace discrimination, without more, is insufficient to make out a constructive discharge claim, which requires a "finding of discrimination and the existence of certain 'aggravating factors.'" *Mungin*, 116 F.3d at 1558 (quoting *Clark v. Marsh*, 665 F.2d 1168, 1174 (D.C. Cir. 1981)). "'Aggravating factors' are those aspects of a discriminatory work environment that, by making the

workplace so disagreeable, would prevent a reasonable employee from seeking remediation on the job." *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006).

Even viewing Plaintiff's allegations in the light most favorable to her, there is no evidence that the mistreatment she suffered made her working conditions so intolerable that a reasonable person in her position would have felt compelled to resign. Plaintiff contends that she was worried about the risk to her retirement benefits if she accepted reassignment because she was part of a specific retirement system—the D.C. Police and Firefighter system—and she considered any role outside the Secret Service to be less prestigious. *See* Pl.'s Opp'n at 13–14; Def.'s MSJ Ex. 3, Jane P. Murphy Dep. Tr. (Sept. 29, 2023) ("Def.'s 2023 Murphy Dep. Tr."), at 254:14–255:8, ECF No. 43-5 (confirming that, with one exception, none of the vacant positions were comparable to her position as Assistant Director). It is also undisputed that Clancy told her that there was no position in the Secret Service for her. Def.'s SUF ¶ 83; Pl.'s SUF ¶ 83. Under these circumstances, she concluded that "the only answer was to retire." Pl.'s Opp'n at 14.

The record reflects that Plaintiff was indeed concerned about how a reassignment might impact her retirement benefits. She testified that the Secret Service is the only DHS component where she would be eligible for a specific retirement benefit. *See* Pl.'s Opp'n Ex. 18, Jane P. Murphy Dep. Tr. (Sept. 29, 2023) ("Pl.'s 2023 Murphy Dep. Tr."), at 156:5–156:17, ECF No. 49-18. She also testified that she spoke to a representative with the D.C. Police and Firefighter system, who confirmed that "no other component was eligible," and if she were to work for another component, "if there was an assignment, it would have to be temporary, otherwise it would be an offset, and it would negatively affect [her] for the rest of [her] life." *Id.* at 156:18–157:2.

On this record, the court finds that Plaintiff has not sufficiently alleged facts that her employer discriminated against her to the point "that a reasonable person in [her] position would

have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Suders*, 542 U.S. at 141). In fact, there is evidence in the record that indicates that one of the four Assistant Directors who was in a similar position did not retire and instead accepted the reassignment offer. Def.'s SUF ¶ 81; Pl.'s SUF ¶ 81.

Being given a short time to make an important and complicated decision might suggest that a choice was involuntary, *Henn v. Nat'l Geographical Soc'y,* 819 F.2d 824, 828–29 (7th Cir. 1987), and it is true that Plaintiff was given little time to decide whether to accept the reassignment. But she was not penalized for taking more than the "one or two" days she was given to consider whether to be reassigned. And when she told Clancy she would retire, he offered her more time to reconsider her decision, which she declined:

> **Q.** Isn't it true that he asked you during that conversation if you needed more time to consider your options?
> **A**. Needed more time. He said that I – "if you needed more time," words to that effect.
> **Q.** And what did you say?
> **A.** I said, "No. Sign the papers," because, well, I was already destroyed. I was in this environment where I'm being told that there's a rumor going around that I had to be escorted out of the building. Based upon the press barrage of negative publicity -- friends and neighbors all had -- everyone had seen -- I had no other choice. I felt like this -- but to retire at that point.

Pl.'s Opp'n Ex. 28, Jane P. Murphy Dep. Tr. (June 7, 2016) ("Pl.'s 2016 Murphy Dep. Tr."), at 164:4–17, ECF No. 49-28.

Plaintiff also testified that Clancy "knew [she] was in the Metropolitan system" and she believed "it was common knowledge that there would be a problem with that," but she also testified that she does not remember actually raising with Clancy her concern about the reassignment and how that would affect her retirement. Pl.'s 2023 Murphy Dep. Tr. at 157:7–17. It is also undisputed that Clancy offered to look into her retirement questions and also into where she might be

reassigned, but when she did not get an immediate response, she felt she had "no other alternative" but to retire and told him to sign her retirement papers:

> There was . . . no position description; there was no location. I had no idea where this reassignment would be. And that, coupled with the fact that . . . I was concerned that the Metro retirement could be jeopardized because no other agency has it. If I had been reassigned to another agency, it would have affected my Metro retirement. So, I had no other alternative. But I had HR prepare my retirement papers, and they were sent to his office.

*See* Pl.'s 2016 Murphy Dep. Tr. at 155:1–156:5.

Plaintiff has not presented sufficient evidence that her employer deliberately created intolerable work conditions that forced her to choose retirement.  The evidence indicates that her employer offered her a reassignment in the event she did not wish to retire.  Although Plaintiff wanted to remain in the Secret Service and was unhappy and frustrated with her options—which she claims made her feel as though she had no option but to retire—she has not demonstrated the type of "aggravating factors" necessary to sustain a constructive discharge claim at summary judgment.  *See, e.g., Atlantic Richfield Co. v. D.C. Comm'n on Hum. Rts.,* 515 A.2d 1095, 1101 (D.C. 1986) (concluding plaintiff was constructively discharged where she "was subject to a continuous barrage of derogatory comments about her appearance, behavior, and morality to the point where her behavior was compared to that of a prostitute"); *Veitch*, 471 F.3d at 131 (recognizing non-selection, re-assignment, change in job duties, job transfer, sharing a small office, and criticism from supervisor, while frustrating, have explicitly been rejected as "aggravating factors"); *Aliotta v. Bair*, 576 F. Supp. 2d 113, 121 (D.D.C. 2008), *aff'd*, 614 F.3d 556 (D.C. Cir. 2010) (A "decision between early retirement and the risk of termination in a . . . reorganization is not sufficiently terrorizing to make acceptance of the early retirement incentive categorically involuntary"); *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 78 (D.D.C. 2006) ("[A] single instance

of workplace 'rejection'—e.g., the denial of a promotion or a lateral transfer—if not 'career-ending,' will not constitute a constructive discharge.")

Finally, as the Supreme Court has explained, a successful claim for constructive discharge requires the same circumstances to establish a hostile work environment claim. Indeed, to establish constructive discharge, a "plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Suders*, 542 U.S. at 134. Thus, a hostile work environment claim is a "necessary predicate" to a constructive discharge claim. *See id.* at 149. Plaintiff has not made out a hostile work environment claim and so her constructive discharge claim necessarily fails. *See, e.g.*, *McKeithan v. Boarman*, No. 11-5247, 2012 WL 1450565, at *1 (D.C. Cir. Apr. 12, 2012) (per curiam) (affirming district court's finding that plaintiff "failed to state a claim of constructive discharge, because he failed to make out an underlying predicate claim of hostile work environment").

### C. Title VII and ADEA Claims

Defendant argues that even if Plaintiff could establish a *prima facie* case of discrimination, Clancy's decision to reassign Plaintiff was based on legitimate, non-discriminatory reasons rather than her sex or age: (1) he determined that she did not possess the qualities he believed the Secret Service needed for a senior leader on his Staff, and (2) the Blue Ribbon Panel confirmed that new senior leadership was needed.

Based on the record evidence and the parties' arguments, and as explained below, the court concludes that Defendant is entitled to summary judgment on Plaintiffs' age and gender discrimination claims.

a. *Whether Defendant Proffered a Non–Discriminatory Reason for Reassignment*

Defendant first contends that because Clancy was appointed following a series of high-profile security breaches, Clancy understood that he was to assess senior leadership and implement changes. Def.'s SUF ¶¶ 16–20, 26–32; Def.'s Mem. at 24–26. Beginning in October, Clancy began to observe and meet with the Assistant Directors. Indeed, according to Dale Pupillo, Clancy "announced that he wanted to meet with everyone." Pl.'s Opp'n, Ex. 9, Dale Pupillo Aff., ECF No. 49-9 at 5. Clancy testified that he had made preliminary decisions by mid-December 2014, but he waited to finalize his decisions until the Blue Ribbon Panel released its findings to ensure that it concurred with his belief that the Secret Service faced leadership deficiencies. Def.'s MSJ Ex. 5, Select Portions of Joseph Clancy Dep. (June 3, 2016) ("Clancy Dep. Tr."), at 164:21–166:7, 183:12–184:12, ECF No. 43-7.

Defendant next argues that, once released, the Report reinforced Clancy's mandate to assess and implement leadership changes, *see* Def.'s Mem. at 27–29, because the Report emphasized that "the question of leadership is . . . the most important" issue facing the agency and concluded that the Secret Service needed "strong, new leadership" and "dynamic, new management." Def.'s SUF ¶¶ 52–54. The panel's findings reinforced Clancy's belief that leadership changes were necessary, and consistent with that assessment, he identified four Assistant Directors, including Plaintiff, whom he concluded did not have the necessary qualities to stay in their roles. *Id.* ¶¶ 69–70, 73; Def.'s Mem. at 28.

Because Defendant's explanations for Plaintiff's reassignment are "reasonable and non-discriminatory," they are "enough to take us to the third step under *McDonnell Douglas*." *Barnette v. Chertoff*, 453 F.3d 513, 516 (D.C. Cir. 2006) (citation omitted). At this stage, Plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence" that Defendants' proffered

reasons were not the "true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000).

    b.   *Whether Plaintiff Proffered Sufficient Evidence that Defendant's Reasons Were Pretext*

A plaintiff can establish that an employer's stated reason for an adverse employment action was a pretext for discrimination by showing that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." *Brady,* 520 F.3d at 495. "If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination." *Aka*, 156 F.3d at 1293.

Plaintiff argues that there is sufficient evidence that Clancy's reasons for removing Plaintiff are pretextual. First, she argues that the Report's recommendations focused on the security of the White House compound; there were no directives "to review the media matters that Plaintiff covered, nor directives to prioritize the handling of the Secret Service's 150th anniversary, or if leaders brought their deputies to meetings," Pl.'s Opp'n at 6, all of which Clancy gave as reasons for finding that she lacked leadership. She also argues that she did not have jurisdiction over the security flaws mentioned in the Report, including the White House fence and perimeter. *Id.* But there is nothing unreasonable in relying on the Report. No one person was singled out in the Report, which favors Plaintiff's position, but it is undisputed that the Report was critical of leadership throughout the Agency and concluded that leadership changes were necessary. This fact favors Defendant's position.

Second, Plaintiff argues that the reasons for finding that she "lacked leadership, pale in comparison to the serious flaws in Secret Service the Blue Ribbon Panel Report identified," including severe security lapses that threatened the President. Pl.'s Opp'n at 6; Pl.'s SUF ¶ 68.

Indeed, she contends that there are material disputes of fact regarding why Clancy believed leadership changes were his primary mandate, Pl.'s Opp'n at 5–6, "given that Secretary Johnson was clear that the mandate was first and foremost to focus on the security of the White House, and made the question of if and what new leadership was needed a secondary and optional consideration."  Pl.'s SUF ¶ 31.

But whether or not Clancy understood this to be his *primary* mandate—rather than a "secondary and optional consideration," *id.*—does not create a genuine issue of material fact where it is undisputed that the Report concluded that leadership changes were needed.  Def.'s SUF ¶¶ 52–55; Clancy Decl. ¶ 22 (quoting portions of the unclassified Executive Summary: "The Panel has concluded that the Service needs strong, new leadership that can drive change within the organization"); *id.* ("Some of the changes address isolated problems, with well-defined options to solve them, while others will require far more study by, we hope, a dynamic new management team that will lead the Service into the future.").  Plaintiff's disagreement with how much weight Clancy actually gave the Report or how he should have interpreted it is insufficient to show pretext, and she has failed to put forward sufficient evidence for a reasonable jury to find that her employer's reason for removing her was not the actual reason.  And as discussed below, Clancy offered an "individualized explanation for why or how" Plaintiff's job was chosen "for the chopping block."  *Steele v. Mattis*, 899 F.3d 943, 949 (D.C. Cir. 2018).

It is undisputed that, once appointed, Clancy began to observe each Assistant Director during staff meetings, and it is undisputed that at these meetings, each Assistant Director was expected to brief the group on what was occurring in his or her directorate.  Def.'s SUF ¶¶ 34–35. After observing Plaintiff in these meetings, in one-on-one briefings, and in preparation for congressional testimony, Clancy concluded that Plaintiff lacked the innovative, dynamic

leadership qualities that he was looking for, as recommended by the Blue Ribbon Panel, *see id.*
¶¶ 34–45, 58, 62–69; Clancy Decl. ¶ 38; Clancy Dep. Tr. at 224:22–227:8, and that she "lacked
vision and fresh ideas for Government and Public Affair[s'] future."  Def.'s SUF ¶ 67.  One reason
was because Plaintiff did not, among other things, "bring him any ideas in terms of how the Agency
could obtain some good press release," *id.* ¶ 68, which was "important to the Agency following
the aftermath of the Agency's negative press, from earlier security breaches."  *Id.* ¶ 65.

Ultimately, Clancy maintained that he "lacked confidence" in Plaintiff's leadership because
he found that she could not "independently articulate what was happening in Government and
Public Affairs," "she relied on her subordinates to perform [] day-to-day work," and "she primarily
read talking points that appeared prepared by someone else during meetings, and could not provide
details about those talking points when questioned by other staff members or Director Clancy."
*See* Def.'s SUF ¶ 64; Clancy Decl. ¶ 38.  Clancy also noted that Plaintiff would bring Deputy
Assistant Directors to meetings and relied on them to relay important information to Clancy.  Def.'s
SUF ¶¶ 36–38, 45, 64.

Plaintiff does not dispute that she brought Deputy Assistant Directors to some meetings,
but she argues that this "was appropriate because Deputy Assistant Directors would be the subject
matter experts within their program areas with the most direct information that needed to be
conveyed to the Director," to prepare him for congressional hearings.  Pl.'s SUF ¶ 45; *see* Def.'s
2023 Murphy Dep. Tr." at 222:17–223:11, 226:6–227:1.  Though she claims that other leaders
"were not similarly penalized," Pl.'s SUF ¶ 36, she offers no support for this proposition, other
than to cite to her own rebuttal of Clancy's testimony, and "[s]elf-serving testimony does not create
genuine issues of material fact, especially where that very testimony suggests that corroborating

evidence should be readily available." *Fields v. Off. of Eddie Bernice Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).

Plaintiff further disputes Clancy's conclusion that she lacked leadership qualities, emphasizing her consistently strong performance evaluations throughout her tenure. The record does indicate—and Defendant does not dispute—that Plaintiff had satisfactory work performance evaluations before she retired. *See* Pl.'s Opp'n Ex. 19, Jane Murphy 2013-2014 SES Annual Performance Evaluation.

A plaintiff may support an inference that her employer's stated reason for an adverse employment action was pretextual by pointing to evidence including "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, [] the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Here, Plaintiff fails to do so as to both claims. Out of the six Assistant Directors, two announced their retirements in late 2014 (Victor Erevia, age 56, and Gregory Marchio, age 56); four were told they would be reassigned (Dale Pupillo, age 60, Paul Morrissey, age 59, Mark Copanzzi, age 57, and Plaintiff, age 55). Of the four, Copanzzi accepted reassignment and took another position within DHS, while Pupillo, Morrissey, and Plaintiff retired. Def.'s MSJ Ex. 8, Declaration of Alvin Smith ¶¶ 52, 56, ECF No. 43-10. Plaintiff was the only female Assistant Director. Clancy did retain one other female employee on his Executive Staff—Chief Counsel Donna Cahill, age 56—but there is no indication that her position was comparable to Plaintiff's.

Clancy retained two male Assistant Directors—Faron Paramore, age 48, and Craig Magaw, age 51—"because he believed they possessed positive leadership characteristics." ECF No. 49-4 ¶ 18. Clancy testified that, based on his observations, he was "impressed" by Paramore's "positive attitude, energy, and fresh ideas he that brought to the Secret Service and appreciated his vision for the future," which was what he was looking for in an Assistant Director. Clancy Decl. ¶ 84. Paramore ultimately replaced Plaintiff. Pl.'s SUF ¶ 43. It is undisputed that Paramore and Magaw were not eligible for the same pension system as Plaintiff and her three colleagues. *Id.*

As to her gender discrimination claim, Plaintiff argues that Clancy favored younger, male colleagues. She claims that Clancy ignored her "in comparison to her male counterparts," and excluded her from meetings in favor of younger men. Pl.'s SUF ¶¶ 36, 40, 43, 52, 71, 102. For example, Plaintiff points to one instance where she was "disinvited" from her "usual role of attending congressional hearings, only to extend the invitation to a younger man." Pl.'s Opp'n at 7. Though she claims this was "odd and/or atypical," she fails to offer corroborating evidence as to how this decision was "odd and/or atypical," pointing only to her own argument that "it sent a message to the workforce of Plaintiff's diminished influence and marginalization within the Secret Service." Pl.'s SUF ¶ 43.

She also argues that "there are disputes as to whether [] Paramore was a more effective leader or better performer than Plaintiff" but points to nothing in the record that reflects this—she points only to her own argument in her response to Defendant's statement of facts that in his prior role, Paramore "oversaw only one of [Government and Public Affairs'] Program areas," and Clancy had also only observed Paramore in a job with "reduced duties and responsibilities compared to Plaintiff." Pl.'s SUF ¶ 105. Plaintiff's argument reveals nothing about Paramore's performance compared to her own, and as the non-moving party, Plaintiff's opposition "must

consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *NAACP Legal Def. & Educ. Fund v. Barr*, 496 F. Supp. 3d 116, 127 (D.D.C. 2020). "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Ultimately, Plaintiff fails to offer sufficient evidence of gender discrimination, and she points to no evidence that would establish discriminatory animus. *Cf. Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 765 (D.C. Cir. 2002) (evidence establishing discriminatory animus included immediate supervisors' "crude, derogatory, and highly offensive remarks" about plaintiff's gender and ethnicity, including statements directly connected to employer's desire to terminate plaintiff). On this record, she has not proffered sufficient evidence from which a reasonable jury could find that Defendant intentionally discriminated against her on the basis of her gender. The court therefore grants Defendant's summary judgment motion as to her gender discrimination claim.

As to her age discrimination claim, to prevail on a motion for summary judgment in an ADEA disparate treatment case, a Plaintiff must produce evidence that "age was *a* [motivating] factor in the challenged personnel action." *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) (emphasis in original). In some discrimination cases, "there is no direct evidence of discriminatory intent—that is, no statement that itself shows" age bias in the challenged employment decision, and such "cases sometimes can be resolved on summary judgment." *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir.

2013) (citations omitted).  "But when the plaintiff offers direct evidence of discriminatory intent, that evidence will generally entitle a plaintiff to a . . . trial."  *Id.* (citations and internal quotation marks omitted).

Plaintiff argues that Defendant "entirely fails to address the substantial direct and circumstantial evidence of discrimination" and that "there is significant evidence in the form of statements by Clancy himself, and others, which were made directly in connection with Defendant's decision to remove the four oldest (and the only female) Assistant Directors."  Pl.'s Opp'n at 9–10.  She argues that numerous comments evidence age bias.  *Id.* at 9.

The court is unpersuaded by Plaintiff's argument.  As an initial matter, she points to news articles and to comments that are not attributed to Clancy but to other, unnamed Secret Service officials.  Pl.'s Opp'n Ex. 29 at 3,  *Four top Secret Service executives told to leave their posts in agency shake-up,* Washington Post (Jan. 14, 2015) ("By creating so many vacancies, some officials said, Clancy could be making room for younger people to move up in the ranks and bring a fresh perspective."), ECF No. 49-29; Pl.'s Opp'n Ex. 37, *Four Secret Service Executives Fired, Stunning an Already Shaken Agency*, New York Observer (Jan. 14, 2015) (unnamed agent commenting that Plaintiff is "a hundred years old as far as law enforcement goes, has no clue"), ECF No. 49-37.

Plaintiff next contends that Clancy himself made statements that were age biased.  It is undisputed that Clancy "sought leaders who had dynamic, fresh ideas, and a vision for the future."  Def.'s SUF ¶¶ 40, 71–72.  He repeatedly stated that he was looking for "fresh perspective," Clancy Dep. Tr. at 228:2–8 ("It was truly about the leadership, a new direction of leadership. And I always use the word fresh perspective and that's what I . . . was looking for, some fresh, new thoughts, enthusiasm, a new way, a new approach."), and indeed, at their January 13 meeting, Clancy told Plaintiff he was reassigning her because he was looking for a "fresh perspective."

Though Plaintiff argues that Clancy's repeated references to seeking "fresh perspectives" is a "proxy for stereotypes about older employees," Pl.'s Opp'n at 10, this type of statement is not inherently ageist. *See Gold v. Gensler*, 840 F. Supp. 2d 58, 68–69 (D.D.C. 2012) (finding interview notes stating that individual's "fresh perspective and new energy" to the job is not an inherently ageist comment giving rise to an inference of discrimination); *Threadgill v. Spellings,* 435 F. Supp. 2d 126, 140 (D.D.C. 2006) (finding nothing discriminatory about manager indicating that he may need to bring "new blood" to a team). And while an ageist statement might be "probative of discrimination," "there must be a nexus between [a] stray remark and the adverse employment decision." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C.), *aff'd* 132 F.3d 1481 (D.C. Cir. 1997) (citation omitted).

No such nexus exists here. Director Johnson announced the formation of an independent panel to evaluate Secret Service leadership; the panel subsequently issued a Report emphasizing the need for "dynamic, new management." After the prior Director's resignation, Clancy was designated as Acting Director, and following months of observation, he reached his conclusion regarding leadership changes. Under these facts, Clancy's statements do not constitute direct of discrimination.

Plaintiff also repeatedly points to the age differences between the Assistant Directors who were retained and those who were told they would be reassigned. Plaintiff was six years older than Paramore, who ultimately replaced her, and four years older than Magaw, the other, younger Assistant Director who was retained. But age differentials are assessed at the *prima facie* stage, *see, e.g.*, *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006), and again, since Defendant has "come[] forward with a legitimate, non-discriminatory reason for the challenged employment action," the court need not analyze the prima facie case. *Brady*, 520 F.3d at 494.

Even assuming Plaintiff could establish a *prima facie* case by showing significant age disparity between herself and her two co-workers, at this stage, she would still have "to put on some evidence, beyond the mere age differential between [her]self and the selectee, demonstrating that age played a role in the particular employment decision." *Reshard v. Peters*, 579 F. Supp. 2d 57, 74 (D.D.C. 2008) (citation omitted), *aff'd sub nom. Reshard v. LaHood*, 358 F. App'x 196 (D.C. Cir. 2009) (citation omitted).  As explained above, she has not shown, for example, that "her credentials were so superior" to her two, younger co-workers, *Barnette v. Chertoff*, 453 F.3d 513, 518 (D.C. Cir. 2006), or any evidence beyond the mere age difference.  A reasonable jury may infer discriminatory intent when an employer fails to select the "significantly" or "markedly" more qualified candidate.  *Aka*, 156 F.3d at 1294, 1298.  But the court "detect[s] no [] significant qualifications differential in this case," *see Barnette*, 453 F.3d at 517, because Plaintiff offers none.

In sum, Plaintiff has not proffered sufficient evidence for a reasonable jury to find that she was the victim of age discrimination.  And when, "after adequate time for discovery and upon motion [a party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the court shall grant summary judgment against that party.  *Celotex*, 477 U.S. at 322.  For these reasons, the court grants Defendant's summary judgment motion as to her age discrimination claim.

## IV.    CONCLUSION

For the reasons above, the court will GRANT Defendant's motion for summary judgment, ECF No. 43.  An Order will accompany this Memorandum Opinion.


Date: September 30, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge